1
2
3
4
5
6
7
8                           UNITED STATES DISTRICT COURT

9                      FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   SEAN SHIELDS,                              No.  2:  10-cv-2866 WBS KJN P

12              Plaintiff,

13        v.                                    ORDER AND FINDINGS AND
                                                RECOMMENDATIONS
14   SERGEANT KOELLING, et al.,

15              Defendants.

16

17   Introduction

18        Plaintiff is a state prisoner, proceeding through counsel, with a civil rights action pursuant

19   to 42 U.S.C. § 1983.  Pending before the court is defendants' summary judgment motion.  (ECF

20   No. 56).  For the reasons stated herein, the undersigned recommends that defendants' summary

21   judgment motion be denied.

22   Legal Standard for Summary Judgment

23        Summary judgment is appropriate when it is demonstrated that the standard set forth in

24   Federal Rule of Civil procedure 56 is met.  "The court shall grant summary judgment if the

25   movant shows that there is no genuine dispute as to any material fact and the movant is entitled to

26   judgment as a matter of law."  Fed. R. Civ. P. 56(a).

27        Under summary judgment practice, the moving party always bears the initial

28   responsibility of informing the district court of the basis for its motion, and identifying those

                                              1

1   portions of "the pleadings, depositions, answers to interrogatories, and admissions on file,

2   together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue

3   of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting then-numbered Fed.

4   R. Civ. P. 56(c).)  "Where the nonmoving party bears the burden of proof at trial, the moving

5   party need only prove that there is an absence of evidence to support the non-moving party's

6   case."  Nursing Home Pension Fund, Local 144 v. Oracle Corp. (In re Oracle Corp. Sec. Litig.),

7   627 F.3d 376, 387 (9th Cir. 2010) (citing Celotex Corp., 477 U.S. at 325); see also Fed. R. Civ. P.

8   56 Advisory Committee Notes to 2010 Amendments (recognizing that "a party who does not

9   have the trial burden of production may rely on a showing that a party who does have the trial

10  burden cannot produce admissible evidence to carry its burden as to the fact").  Indeed, summary

11  judgment should be entered, after adequate time for discovery and upon motion, against a party

12  who fails to make a showing sufficient to establish the existence of an element essential to that

13  party's case, and on which that party will bear the burden of proof at trial.  Celotex Corp., 477

14  U.S. at 322.  "[A] complete failure of proof concerning an essential element of the nonmoving

15  party's case necessarily renders all other facts immaterial."  Id. at 323.

16          Consequently, if the moving party meets its initial responsibility, the burden then shifts to

17  the opposing party to establish that a genuine issue as to any material fact actually exists.  See

18  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting to

19  establish the existence of such a factual dispute, the opposing party may not rely upon the

20  allegations or denials of its pleadings, but is required to tender evidence of specific facts in the

21  form of affidavits, and/or admissible discovery material in support of its contention that such a

22  dispute exists.  See Fed. R. Civ. P. 56(c); Matsushita, 475 U.S. at 586 n.11.  The opposing party

23  must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome

24  of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

25  (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir.

26  1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return

27  a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436

28  (9th Cir. 1987).

2

1        In the endeavor to establish the existence of a factual dispute, the opposing party need not

2    establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual

3    dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at

4    trial." T.W. Elec. Serv., 809 F.2d at 630.  Thus, the "purpose of summary judgment is to 'pierce

5    the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'"

6    Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963

7    amendments).

8        In resolving a summary judgment motion, the court examines the pleadings, depositions,

9    answers to interrogatories, and admissions on file, together with the affidavits, if any.  Fed. R.

10   Civ. P. 56(c).  The evidence of the opposing party is to be believed.  See Anderson, 477 U.S. at

11   255.  All reasonable inferences that may be drawn from the facts placed before the court must be

12   drawn in favor of the opposing party.  See Matsushita, 475 U.S. at 587.  Nevertheless, inferences

13   are not drawn out of the air, and it is the opposing party's obligation to produce a factual

14   predicate from which the inference may be drawn.  See Richards v. Nielsen Freight Lines, 602 F.

15   Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987).  Finally, to

16   demonstrate a genuine issue, the opposing party "must do more than simply show that there is

17   some metaphysical doubt as to the material facts. . . .  Where the record taken

18   as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no

19   'genuine issue for trial.'"  Matsushita, 475 U.S. at 586 (citation omitted).

20   Plaintiff's Claims

21       This action is proceeding on the original complaint against defendants Koelling and

22   Martinez.  (ECF No. 1.)  Plaintiff alleges that on April 19, 2009, defendants came to his cell and

23   told him to move to the upper bunk.  (Id. at 9.)  Plaintiff told defendants that he had a valid lower

24   bunk chrono.  (Id.)  Defendants told plaintiff that they did not care and told him to move to the

25   upper bunk.  (Id.)  As a result of being housed in the upper bunk, a few days later plaintiff fell

26   from the upper bunk.  (Id. at 10.)  Plaintiff suffered a concussion and a back injury.  (Id.)

27       Plaintiff alleges that defendants violated the Eighth Amendment by making him move to

28   the upper bunk.

3

1   Discussion

2          Defendants move for summary judgment on the grounds that they did not violate

3   plaintiff's Eighth Amendment rights and on the grounds that they are entitled to qualified

4   immunity.

5              *Legal Standard for Eighth Amendment Claim*

6          A prison official's deliberate indifference to an inmate's serious medical needs constitutes

7   cruel and unusual punishment in violation of the Eighth Amendment.  Estelle v. Gamble, 429

8   U.S. 97, 104 (1976); Johnson v. Meltzer, 134 F.3d 1393, 1398 (9th Cir. 1998).  The Eighth

9   Amendment also prohibits deliberate indifference that subjects an inmate to an excessive risk of

10  future harm.  Helling v. McKinney, 509 U.S. 25, 33 (1993).

11         To state a constitutional violation under the Eighth Amendment due to deliberate

12  indifference, a prisoner plaintiff must allege both that the deliberate indifference of medical

13  personnel was objectively serious, and that the defendant officials acted with a subjectively

14  culpable state of mind.  Estelle, 429 U.S. 103.  The prisoner plaintiff must allege that "the official

15  knew of and disregarded a substantial risk of serious harm to [the prisoner's] health or safety."

16  Johnson v. Meltzer, 134 F.3d 1393, 1398 (9th Cir. 1998) (citing Farmer v. Brennan, 511 U.S.

17  825, 837 (1994)).  The court must focus on what the prison official actually perceived, not what

18  he or she should have known.  Farmer, 511 U.S. at 837-38.

19         Deliberate indifference requires that defendants purposefully ignore or fail to respond to

20  the prisoner's pain or medical need.  McGuckin v. Smith, 974 F.2d 1050, 1060 (9th Cir. 1991),

21  overruled on other grounds by WMX Techs., Inc. v. Miller, 104 F.3d 1133 (9th Cir. 1997) (en

22  banc); Hutchinson v. United States, 838 F.2d 390, 394 (9th Cir. 1988) (deliberate indifference

23  may be found where prison officials "deny, delay or intentionally interfere with medical

24  treatment, or it may be shown by the way in which prison physicians provide medical care.").

25  However, neither an inadvertent failure to provide medical care by prison authorities, nor

26  negligence or malpractice by medical staff, constitutes deliberate indifference.  Estelle, 429 U.S.

27  at 107.

28  ////

4

1         *Legal Standard for Qualified Immunity*

2         In analyzing a claim of qualified immunity, a court must examine (1) whether the facts as

3 alleged, taken in the light most favorable to plaintiff, show that the defendant's conduct violated a

4 constitutional right, and (2) if a constitutional right was violated, whether, "in light of the specific

5 context of the case," the constitutional right was so clearly established that a reasonable official

6 would understand that what he or she was doing violated that right.  <u>See</u> <u>Saucier v. Katz</u>, 533 U.S.

7 194, 201–02 (2001).  If no constitutional right was violated, the inquiry ends and the defendant

8 prevails.  <u>Saucier</u>, 533 U.S. at 201.

9         To meet the "clearly established" requirement, "[t]he contours of the right must be

10 sufficiently clear that a reasonable official would understand that what he is doing violates that

11 right." <u>Anderson v. Creighton</u>, 483 U.S. 635, 640 (1987).  This requires defining the right

12 allegedly violated in a "particularized" sense that is "relevant" to the actual facts alleged.  <u>Id.</u>

13 "Because the focus is on whether the officer had fair notice that her conduct was unlawful,

14 reasonableness is judged against the backdrop of the law at the time of the conduct."  <u>Brosseau v.</u>

15 <u>Haugen</u>, 543 U.S. 194, 198 (2004).

16         Courts are not required to address the two inquiries in any particular order.  Rather, courts

17 may "exercise their sound discretion in deciding which of the two prongs of the qualified

18 immunity analysis should be addressed first in light of the circumstances in the particular case at

19 hand." <u>Pearson v. Callahan</u>, 555 U.S. 223, 243 (2009).

20         *Objective Component of Deliberate Indifference:  Risk of Harm*

21         Defendants argue that they are entitled to summary judgment because plaintiff did not

22 meet the objective component of deliberate indifference in that he did not face a substantial risk

23 of harm if moved to an upper bunk.

24         Defendants first argue that plaintiff had no medical necessity for a lower bunk chrono on

25 April 19, 2009.  In support of this claim, defendants refer to the declaration of Dr. Bruce Barnett,

26 the Chief Medical Receiver, Receiver's Office of Legal Affairs for the California Department of

27 Corrections and Rehabilitation ("CDCR").  (ECF No. 65-1 at 8.)  In his declaration, Dr. Barnett

28 lists the medical records he reviewed in forming his professional medical opinion.  (<u>Id.</u> at 10.)

Those records, listed chronologically, indicate that Dr. Barnett reviewed two entries from plaintiff's medical records prior to the April 19, 2009 incident:  1) 7/21/08 chrono approved for "bottom bunk," 1 year, cane 1 year, tennis shoes 1 year.  No mopping or scrubbing floors for one year"; and 2) 1/6/09 – as reported in progress note, dated 7/28/11—MRI Lumbar spine, degenerative disc disease with large disc protrusion centrally and slightly to left.   (Id. at 10.)

Dr. Barnett states that, in his professional opinion, plaintiff did not require a lower bunk chrono in April 2009:

> 10. In my opinion, there is no medical indication that Mr. Shields currently suffers from any significant headaches or low back pain which could be attributed to the purported fall from his bunk on April 22, 2009.  Furthermore, Mr. Shields is not currently suffering from any substantial injury medically related to the purported post traumatic headaches and low back pain that he alleges were caused and/or aggravated by his fall on April 22, 2009.  My analysis is based upon my review of his deposition, medical records documenting this patient's encounters with healthcare providers in 2008 through 2012, my training and experience, and upon updated information from the patient's current treating physician.

> Moreover, I do not find there was a medical need to provide inmate Shields with a bottom bunk chrono in 2009 nor does there appear to be a medical necessity to provide him with a bottom bunk chrono at this time.  Based on my experience and knowledge, I am aware that oftentimes the provision of a bottom bunk chrono is offered as a conciliatory gesture to meet the preference of the inmate, rather than based upon a medical necessity.  Accordingly, the assignment of an upper bunk, although distressing to the inmate, could not have been the result of indifference to a serious medical condition – insofar as Sean Shields' medical condition did not necessitate a bottom bunk.

> ----

> 12.  **Low back pain reported by Plaintiff following his April 2009 fall was in fact present before the fall and has gotten better, not worse over time.  The April 2009 fall did not cause Plaintiff to suffer any further harm or injury to his back.**

> Plaintiff did undergo an MRI study of his lumbar spine in January 2009 that revealed a herniated disc at L4-L5 vertebrae.  But MRI studies do not accurately or consistently correlate with clinical disease or pain.   An oft cited 1994 study published in the authoritative New England Journal of Medicine noted that more than half the patients studied without any symptoms nonetheless showed a bulging disc in at least one level.  The author concluded that "On MRI examination of the lumbar spine, many people without back pain have disk bulges or protrusions...The discovery by MRI of bulges or protrusions wi[th] people with low back pain

6

may frequently be coincidental."  (N. Engl. J. Med. 1994; 331: 69-73.)

Indeed, Sean Shields has not overtly displayed any disability beyond his claim of pain and the statements that sometimes his "back gives out."  He has asked for a cane, but in the past few years is seen walking without it.  Even when he used a cane, there were no physical findings or evidence of neurological compromise to explain the need for a cane.  Strong evidence of the insignificance of his low back pain is his enthusiasm for work in May 2010, his ability to engage in an attack on staff in October 2010, and his apparent participation in a riot in 2012.  There is no evidence in the medical record that Plaintiff has suffered severe low back pain, nerve damage or other back disorder that impairs his daily activities.

13. **There was no medical necessity for a bottom bunk chrono on or around April 19, 2009 and thereafter.**

Guidelines are published to help determine which inmates need a bottom bunk or are most qualified on a *medical basis* for a bottom bunk as opposed to an upper bunk.  These guidelines are published as part of Inmate Medical Services Policies and Procedures (IMSP & P), which state that the primary care provider shall consider the following circumstances appropriate for a low bunk accommodation:  Seizure; balance problems; dementia; back surgery in past 6 months; full-time wheel chair use; blindness; amputations; severe orthopedic conditions in the hips/knees, ankles or upper extremity that prevent climbing; advanced age (over 60); extreme obesity (BMI greater than 40); pregnancy.  Mr. Shields fit none of these criteria and was therefore not overtly in need of a bottom bunk.

Bottom bunk requests may be honored even if the accommodation is not medically necessary or needed according to the guidelines, as a conciliatory gesture for the inmate/patients.    An inmate's preference for a bottom bunk does not trump security concerns, provided there is no discernable risk of harm to the inmate.  In Mr. Shields' case, I find no medical condition that mandated a bottom bunk.

(ECF No. 56-1 at 13, 16.)

In his opposition, plaintiff attached a first level appeal response dated January 10, 2006, and signed by Chief Physician Dr. Thor.  (ECF No. 73-1 at 26-27.)  In this grievance, plaintiff claimed to have lumber spondylosis and lumbar discogenic narrowing of the disk that caused him severe pain.  (Id. at 26.)  In the response, Dr. Thor wrote that Dr. Tan evaluated plaintiff on January 6, 2006, and at that time plaintiff was placed on Naproxen and Baclofen for pain.  (Id. at 27.)  Dr. Thor wrote that Dr. Rallos completed an ADA 1845 form on January 6, 2006, verifying

1    that plaintiff was a mobility impaired inmate and "your chronos will be renewed before their

2    expiration date." (Id.)

3          In his opposition, plaintiff also submitted a 6 month lower bunk chrono he received from

4    Dr. Traquina on September 13, 2006. (Id. at 29.) Plaintiff also submitted another 6 month lower

5    bunk chrono he received on June 18, 2007. (Id. at 31.) The undersigned cannot make out the

6    name of the doctor who signed this chrono. On July 2008, plaintiff's lower bunk chrono was

7    renewed for one year. (Id. at 33.) This chrono is signed by Ken Collinsworth and the Chief

8    Medical Officer. (Id.)

9          Plaintiff also has submitted a memorandum dated August 19, 2008, prepared by Dr.

10   Rallos, Chief Physician at California State Prison-Solano ("CSP-Solano"). (Id. at 23-24.) This

11   memorandum was prepared in response to an administrative appeal filed by plaintiff alleging that

12   he suffered chronic back pain. (Id.) As relief plaintiff requested, in part, a lower bunk chrono.

13   (Id.)

14         Dr. Rallos states, in relevant part,

15             Results of the inquiry revealed an MRI of your lumbar spine,
            which was taken on June 13, 2008, showed degenerative disc
16          disease. You also told Dr. Hsieh that you have a history of back
            problems and you have had back pain for approximately 20 years.
17          You were evaluated by Dr. Collinsworth on July 17, 2008, and your
            chronos for a lower bunk and a cane were renewed. However, the
18          limited duty chrono that was issued to you only stated "no mopping
            or scrubbing of floors" for 1 year.  Also, a back brace or an extra
19          mattress is not medically indicated.

20             DETERMINATION:   Based on the foregoing, your appeal is
            partially granted in that your lower bunk and cane chrono were
21          renewed and you were issued a light duty chrono that states "no
            mopping or scrubbing of floors."  Your attending physician did not
22          state you could lift no more than ten pounds.

23   (Id.)

24         Although not clearly stated in his declaration, it appears that Dr. Barnett based his opinion

25   that plaintiff did not meet the criteria for a lower bunk chrono in April 2009 on his review of

26   plaintiff's medical records after the April 2009 incident. In his declaration, Dr. Barnett states that

27   he reviewed plaintiff's medical records from 2008, but he does not identify them in his

28   declaration. Dr. Barnett identifies only one medical record that he reviewed from prior to the

                                          8

1   April 2009 fall, i.e., the January 2009 MRI.  Dr. Barnett discussed the January 2009 MRI in the

2   section of his declaration addressing his opinion that the April 2009 fall did not cause plaintiff to

3   suffer any further harm to his back.  Dr. Barnett did not clearly base his opinion that plaintiff did

4   not require a lower bunk chrono in April 2009 on the January 2009 MRI.

5        Plaintiff has presented evidence that he had chronos for a lower bunk based on back pain

6   from at least 2006, i.e., approximately three years before the April 2009 incident.  These chronos

7   were issued by several different physicians.  There is no indication in Dr. Barnett's declaration

8   that he reviewed any of the medical records relevant to the issuance of these chronos.

9        In the summary judgment motion, defendants argue that plaintiff's medical exams

10   following the incident, as listed in Dr. Barnett's declaration, demonstrate that plaintiff did not

11   require a lower bunk chrono.  These records are summarized below.

12        On August 20, 2009, plaintiff reported "bad back spasms ...I need to get a lay-in."  (ECF

13   No. 56-1 at 11.)  The exam finding was normal and plaintiff was advised to avoid strenuous

14   activity.  (Id.)  On January 7, 2010, plaintiff reported that his back condition was becoming

15   worse.  (Id.)  The exam results were "unremarkable, walks with cane."  (Id.)  On July 14, 2010,

16   plaintiff received a bottom bunk chrono for one year.  (Id. at 12.)   A progress note dated

17   December 20, 2010, states that plaintiff sought a double mattress and an extra pillow.  (Id.)

18   Plaintiff was assessed with moderate to severe degenerative disc disease and was found eligible

19   for accommodations; plaintiff was given an extra mattress but denied an extra pillow.  (Id.)  On

20   July 20, 2012, plaintiff reported that his back went out.  (Id.)  On December 6, 2012, plaintiff was

21   diagnosed with lumbar degenerative disc disease and ordered to receive physical therapy.  (Id. at

22   13.)

23        Plaintiff's medical records after the April 2009 incident are relevant in evaluating whether

24   plaintiff required a lower bunk chrono at that time.  However, because Dr. Barnett did not review

25   plaintiff's medical records prior to the April 2009 incident, the undersigned finds that his

26   declaration creates a dispute as to whether plaintiff medically required a lower bunk chrono in

27   ////

28   ////

1   April 2009.[1]

2          Defendants also cite plaintiff's May 12, 2010 request that he not be removed from his job,

3   his alleged attack on staff on October 2010, and his alleged participation in a riot in October 4,

4   2012 as evidence that he did not require a lower bunk chrono in April 2009.  (Id.)  It does not

5   appear that Dr. Barnett based his opinion that plaintiff did not require a lower bunk chrono in

6   April 2009 on these somewhat remote incidents.

7          Defendants also argue that plaintiff's lack of harm from the fall demonstrates that placing

8   him in the upper bunk did not subject him to a substantial risk of serious harm.  In support of this

9   argument, defendants refer to Dr. Barnett's declaration and the entry in plaintiff's medical records

10  from his trip to the emergency room the day after the fall.  (ECF No. 56-1 at 11.)  Plaintiff was

11  diagnosed with post-concussion syndrome and cervical sprain by the emergency room doctor.

12  (Id.)  Regarding this diagnosis, Dr. Barnett states,

13              11.  Mr. Shields did not sustain a head injury on or around April 22,
            2009 serious enough to produce a concussion.  The symptoms he
14          alleges after April 22, even if present, were very mild and did not
            last more than a year.   Any persistent headaches Shields may
15          continue to suffer are very mild and unrelated to his purported April
            2009 fall.
16
            The diagnoses made by an emergency room physician, and
17          reiterated thereafter by neurologists are not determinative.   To
            properly diagnosis a concussion there needs to be some symptoms.
18          A mild blow to the head with no symptoms whatsoever is not a
            concussion.  Here, Plaintiff did not lose consciousness and was not
19          at all dazed.  There was no observed head or scalp lesion.  All of the
            X ray studies were reported as normal.  It is highly unlikely that
20          plaintiff suffered a concussion with his purported fall.

21          It is possible to have a head injury that causes prolonged headaches
            after head trauma without loss of consciousness.  But such cases are
22          rare, occurring far less than 5% of all head injury.  The aftermath of
            such mild head injuries, if they are still to be called concussions, is
23          also very mild.  As reassured by the consulting neurologist in his
            December 2009 exam, Shields' headaches should dissipate without
24          any treatment.   The medical record and plaintiff's deposition
            indicate that this is the case.  As of 2010, Mr. Shields was not
25
_____
26  [1]  The undersigned observes that after April 2009, plaintiff continued to receive lower bunk
    chronos as well as other treatment (an extra mattress, pain medication, physical therapy) for his
27  "moderate to severe disc disease."  The undersigned also notes his puzzlement at Dr. Barnett's
    opinion that plaintiff's receipt of lower bunk chronos was a "conciliatory gesture," considering
28  the duration of plaintiff's receipt of these chronos.

impaired in any of his activities.  He asked to work and reported no disability.   His examinations have been consistently normal in every clinical encounter for the past four years up to the present day.

His deposition testimony that he suffers significant headaches every other day is not credible.  There are no similar complaints anywhere in the medical record.   Furthermore, Plaintiff has not accepted medical therapy that would treat chronic/constant headaches.  He has turned down all treatment with Elavil and not taken his doses of propranolol as prescribed.

It is also relevant that [plaintiff] has been housed in Administrative Segregation following an October 2010 attack on custody and the accusation of participation in a riot on October 2012.   These aggressive acts, his stated ability and interest in full time work and his consistently normal examinations indicate he is not impaired by headache, low back pain or any other ailment.

Plaintiff may have headaches from time to time.  His health care provider has repeatedly diagnosed "tension headaches."  These are the run of the mill headaches virtually all persons can have from time to time.  Plaintiff's descriptions of vague, varied headaches with unpredictable and brief duration are typical for tension headaches.  These headaches are unrelated to and not caused by the April 2009 fall.  In short, there is no evidence in the medical record that plaintiff continues to suffer significant headaches on account of his purported April 2009 fall.

(ECF No. 56-1 at 14-15.)

Attached as an exhibit to Dr. Barnett's declaration is the April 23, 2009 report by the emergency room physician who examined plaintiff.  (Id. at 25-27.)  This report states, "Neuro: Positive for headaches, loss of consciousness."  (Id. at 25.)  The emergency room doctor diagnosed plaintiff with post-concussion syndrome and cervical sprain.  (Id. at 27.)

Dr. Barnett's declaration calls into question the diagnosis of the emergency room physician as well as the duration and extent of plaintiff's injuries.  For this reason, the undersigned finds that whether plaintiff suffered injuries as a result of his fall, as well as the nature and extent of those injuries, are disputed material facts.

Defendants also argue that plaintiff did not face a serious risk of harm from being placed in the upper bunk because there is no evidence that plaintiff's being placed in upper bunk caused his fall.  In support of this argument, defendants cite Dr. Barnett's declaration:

////

11

1    14.   There is no medical or scientific basis in fact to demonstrate
     that inmate Shields' purported fall on April 22, 2009 was caused by
2    being placed in an upper bunk.

3    I have reviewed Mr. Shields' Citizen's Complaint against personnel
     a week after the fall, in which he indicates he was "attempting to
4    get down from the top bunk and my back went out on me and I
     fell."  This makes no logical sense.  His back "collapse" (whatever
5    that means) has no effect on climbing up or down from a bunk.
     Climbing in and out of a bunk requires the use of arms and legs, not
6    the back.  For a person's back to so utterly "collapse" would require
     nerve damage and paralysis.  Sean Shields was not paralyzed.  He
7    has no medically documented neurological disease.

8    (ECF No. 56-1 at 16.)

9         In his declaration, Dr. Barnett also states that the Inmate Medical Services Policies and

10   Procedures ("IMSP & P") state that the primary care provider shall consider low bunk

11   accommodation in several circumstances including back surgery in the past 6 months and severe

12   orthopedic conditions in the upper extremity that prevent climbing.  (Id. at 16.)  Dr. Barnett's

13   opinion that climbing in and out of a bunk does not require the use of the back is in contrast to the

14   IMSP & P guidelines that back surgery as well as severe orthopedic conditions in the upper

15   extremity may warrant low bunk accommodations.

16        As discussed above, plaintiff has presented evidence that he was issued lower bunk

17   chronos from three years prior to April 2009 due to back pain.  Dr. Barnett apparently did not

18   review plaintiff's medical records relevant to the issuance of these chronos.

19        Significantly, the undersigned also questions defendants' ability to offer expert testimony

20   seeking to rewrite history.  It is undisputed that plaintiff had been issued lower bunk chronos by

21   his medical providers.  Defendants do not contend that they ignored the chromos because they did

22   not believe that they were medically necessary.  Therefore, defendants' expert Dr. Barnett now

23   attempting to question the necessity of the chronos appears largely irrelevant.  "It is well

24   established that deliberate indifference may be shown when prison officials ignore express orders

25   from a prisoner's treating physician."  See  Estelle v. Gamble, 429 U.S. 97, 104-05 (1976).

26        For the reasons discussed above, the undersigned finds that whether plaintiff being housed

27   in the upper bunk caused his fall is a disputed material fact.

28   ////

12

1    For the reasons discussed above, the undersigned recommends that defendants' motion for

2    summary judgment on the grounds that plaintiff did not face a serious risk of harm from being

3    placed in the upper bunk be denied because of the disputed material facts.

4    *Subjective Component of Deliberate Indifference:  Disregard Risk of Harm*

5    Defendants move for summary judgment on grounds that they did not knowingly

6    disregard any risk of harm to plaintiff by moving him to the upper bunk.

7    It is undisputed that when defendants came to plaintiff's cell and told him to move to the

8    upper bunk, plaintiff told them that he had a lower bunk chrono but could not produce it.

9    (Plaintiff's Deposition Transcript at 12-12; defendants' declarations (ECF Nos. 56-1 at 2, 5.)).  It

10   is also undisputed that the change in bunks was not punitive.  According to plaintiff, the change in

11   bunks was made to accommodate plaintiff's cellmate, Ronnie Winn, who also had a lower bunk

12   chrono.  (ECF No. 73-1 at 56-57.)

13   Plaintiff has presented evidence that when defendants told him to move to the upper bunk,

14   he pointed defendants to a sign on his door indicating that he was disabled.  In his declaration

15   attached to plaintiff's opposition, inmate Winn states that when defendants told plaintiff to move

16   to the upper bunk, plaintiff told defendant Koelling that he could not find the lower bunk chrono

17   but directed him to the ADA sign on the door.  (ECF No. 73-1 at 57.)  At his deposition, plaintiff

18   testified that he directed defendants to the blue sign, i.e., ADA sign, on the door.  (Plaintiff's

19   Deposition at 12: 23-25.)  One of the defendants said, "I don't care about that.  You still have to

20   get on the top bunk."  (Id. at 12: 25–13: 1.)  The blue sign said "DNM" and "ADA."  (Id. at 13: 2-

21   5.)  The sign designated plaintiff as disabled.  (Id. at 13: 10-12.)

22   At his deposition, defendant Koelling testified that inmates with physical disabilities can

23   have a blue sign affixed to the outside of their cell.  (Koelling deposition transcript at 35: 13-16.)

24   If the inmate has a mobility impairment, the sign says, "DNM."  (Id. at 36:  1-5.)  The signs are

25   approximately three inches by five inches.  (Id. at 37: 22-24.)  Defendant Koelling testified that he

26   could not recall if plaintiff had a blue sign on his cell door.  (Id. at 55:  14-16.)  Defendant

27   Koelling testified that if there was a blue sign on plaintiff's door, that is something he should

28   have noticed.  (Id. at 55: 17-20.)

At his deposition, defendant Martinez testified that, to his recollection, he did not notice a blue "DNM" sign on plaintiff's cell door on the day of the incident.  (Martinez declaration at 45: 11-14.)  Defendant Martinez also testified that if he had seen a "DNM" sign on plaintiff's cell door, he would not have required plaintiff to move to the upper bunk because that would have been some indication that he was mobility impaired.  (Id. at 55: 6-11.)

Plaintiff has presented evidence that he told defendants that he had a lower bunk chrono, although he could not find it, and that he directed defendants to a sign on his door indicating that he was mobility impaired.  These facts, taken in the light most favorable to plaintiff, demonstrate that defendants knowingly disregarded a serious risk of harm to plaintiff.  The undersigned further finds that a reasonable officer would have known, under these circumstances, that moving plaintiff to the upper bunk violated his Eighth Amendment rights.  As noted above, at his deposition, defendants Martinez testified that if he saw the sign on plaintiff's door indicating that he was mobility impaired, he would not have moved plaintiff to the upper bunk.  For these reasons, defendants are not entitled to summary judgment as to this claim.[2]

---

[2]      In the opposition, plaintiff argues that both defendants testified at their depositions that if an inmate cannot produce a lower bunk chrono when asked to move to the upper bunk, the best practice is to confirm whether the inmate has a valid chrono.  The undersigned has reviewed the deposition testimony of both defendants regarding whether and how they could have checked to see if plaintiff had a lower bunk chrono.  It is difficult to determine from defendants' deposition testimony how difficult it would have been for them to check whether an inmate had a valid lower bunk chrono.  For this reason, the undersigned does not find that defendants acted with deliberate indifference by failing to check to see if plaintiff had a valid lower bunk chrono.

In his opposition, plaintiff also argues that the court's holding in Stringham v. Bick, 2:09-cv-286 MCE DAD P, is determinative of the pending motion.  In Stringham, plaintiff's treating physicians recommended cell housing for plaintiff, whereas defendant Dr. Bick disagreed, believing instead that a dormitory assignment could meet plaintiff's medical needs.  (2:09-286 MCE DAD P, ECF No. 89 at 66-67.)  Magistrate Judge Drozd found that defendant Bick was not entitled to summary judgment.  (Id. at 70.)  "It is well established that deliberate indifference may be shown when prison officials ignore express orders from a prisoner's treating physician.  See Estelle, 429 U.S. at 104-05."  (Id. at 71.)

As noted above, the issues raised in this case are different from the issues in Stringham.  In the instant case, defendants do not appear to claim that they substituted their own judgment over plaintiff's treating physicians' judgment regarding plaintiff's need for a lower bunk chrono.  Instead, defendants claim that they ordered plaintiff to the top bunk because he had no proof of the lower bunk chrono.

1          *Defendants' Declarations*

2                 In his opposition, plaintiff argues that defendants' declarations contain "false" statements

3     that should not be accepted by the court.  In particular, plaintiff argues that at their depositions,

4     conducted February 14, 2014, both defendants stated that they could not recall the events of April

5     19, 2009.  In contrast, in their declarations submitted in support of the pending summary

6     judgment motions, signed June 4 and 5, 2013, both defendants made statements demonstrating

7     some recall of the events of April 19, 2009.  (ECF No. 56-1 at 2-3, 5-6.)  In amended responses to

8     a request for admission dated May 16, 2012, defendants stated that they did not independently

9     recall the incident, but that the July 9, 2009 memorandum refreshed their recollection.  (ECF No.

10    73-1 at 85, 93.)

11                The general rule in the Ninth Circuit is that a party cannot artificially manufacture a

12    genuine issue of fact, and thereby avoid summary judgment, by submitting an affidavit which

13    contradicts prior sworn testimony.  Kennedy v. Allied Mut. Ins. Co., 952 F.2d 262, 266 (9th Cir.

14    1991).  "[I]f a party who has been examined at length on deposition could raise an issue of fact

15    simply by submitting an affidavit contradicting his own prior testimony, this would greatly

16    diminish the utility of summary judgment as a procedure for screening out sham issues of fact."

17    Id.  However, because of the jury's role in resolving questions of credibility, courts have urged

18    caution when applying the sham affidavit rule.  Id., citing Kennet Murray Corp. v. Bone, 622 F.2d

19    887, 894 (5th Cir. 1980).  To this end, the Ninth Circuit requires the court to make certain factual

20    findings before striking a declaration as a sham.  Van Asdale v. Int'l Game Tech., 577 F.3d 989,

21    998 (9th Cir. 2009).  First, the court must find that the affidavit is a sham, or created specifically

22    to avoid summary judgment; and second, that the inconsistency between the prior sworn

23    testimony and the declaration is "clear and unambiguous."  Id.

24                To justify invocation of the sham affidavit rule, "the inconsistency between a party's

25    deposition testimony and subsequent affidavit must be clear and unambiguous."  Id.  For

26    example, the Ninth Circuit upheld a district court striking sham affidavits where the deponent

27    could not remember the answers to approximately 185 questions in his deposition, but suddenly

28    recalled them "with perfect clarity" in his declaration submitted with his response to the motion

1   for summary judgment.  Yeager v. Bowlin, 693 F.3d 1076, 1080 (9th Cir. 2012).  "Several of our

2   cases indicate that a district court may find a declaration to be a sham when it contains facts that

3   the affiant previously testified he could not remember."  Id. at 1081.  "In Scamihorn v. General

4   Truck Drivers, we implied this result in dicta when we noted that a declaration could be

5   considered a sham if the declarant provides information which he had testified he could not recall.

6   282 F.3d 1078, 1085 n.7 (9th Cir. 2002)."  Id.

7           The undersigned is troubled by the statements in defendants' declarations indicating their

8   ability to recall the events of April 19, 2009, which contrasts with their inability to recall the

9   events at their depositions.  However, for purposes of this pending motion what occurred between

10   plaintiff and defendants on April 19, 2009 is largely undisputed.  Moreover, the undersigned

11   recommends herein denial of defendants' motion.  For these reasons, at this time the undersigned

12   need not reach the credibility issue raised by plaintiff in his opposition.

13   Conclusion

14           For the reasons discussed above, the undersigned recommends that defendants' summary

15   judgment motion be denied.

16           On May 22, 2014, defendants filed a motion for an extension of time to file their reply.

17   (ECF No. 78.)  Good cause appearing, this motion is granted.  Defendants' reply is deemed

18   timely filed.

19           Accordingly, IT IS HEREBY ORDERED that defendants' motion for an extension of

20   time to file their reply (ECF No. 78) is granted; and

21           IT IS HEREBY RECOMMENDED that defendants' summary judgment motion (ECF

22   No. 56) be denied.

23           These findings and recommendations are submitted to the United States District Judge

24   assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days

25   after being served with these findings and recommendations, any party may file written

26   objections with the court and serve a copy on all parties.  Such a document should be captioned

27   "Objections to Magistrate Judge's Findings and Recommendations."  Any response to the

28   objections shall be filed and served within fourteen days after service of the objections.  The

1  parties are advised that failure to file objections within the specified time may waive the right to

2  appeal the District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

3  Dated:  August 11, 2014

4

5  Shields.sj(2)

KENDALL J. NEWMAN
UNITED STATES MAGISTRATE JUDGE

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28